IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

PROGRESSIVE SEPTIC, INC.,

   *Plaintiff,*

   v.                             Civil Action No.: ELH-09-03446

SEPTITECH, LLC, *et al.*,

   *Defendant.*

## MEMORANDUM OPINION

Progressive Septic, Inc. ("Progressive")[1] filed suit against SeptiTech, LLC; ST Liquidating Corp. ("ST"); and CSE Enterprises LLC ("CSE"), claiming, *inter alia,* breach of contract (Count Two) and tortious interference with contract (Count Six).[2] SeptiTech, LLC has filed a Motion For Summary Judgment ("SeptiTech Motion," ECF 36). Progressive opposes that motion, and has also filed a Cross-Motion for Partial Summary Judgment As To Liability ("Progressive Motion," ECF 41). The issues have been fully briefed and no hearing is necessary. *See* Local Rule 105.6. For the reasons that follow, the Court will grant SeptiTech, LLC's motion and deny Progressive's motion.

## Factual Background

Progressive, formed in 2000, is a Maryland corporation owned solely by Ronald Bruce Melton (known as Bruce). It was created "[p]rimarily" to conduct "Septic Service inspections for real estate transfers." SeptiTech Motion Ex. A 13:15-13:16. Bruce Melton's son,

---

[1] In its Complaint (ECF 3), Progressive identifies itself as "Progressive Septic, Inc." Curiously, in later filings, Progressive identifies itself as "Progressive Septic Services, Inc." The Court will use the name of the plaintiff as it appears in the Complaint.

[2] Jurisdiction is based on diversity of citizenship. *See* 28 U.S.C. § 1332. Progressive has dismissed all claims against CSE, and it has also dismissed Counts Three, Four, and Five of the Complaint as to SeptiTech, LLC, with prejudice. ST (formerly SeptiTech, Inc.) has not been served. Therefore, only Counts Two and Six against SeptiTech, LLC are at issue.

Christopher Ryan Melton (known as Ryan), is also actively involved in the operation of Progressive. *Id.* at 16:1-16:3; *see also* SeptiTech, LLC's Memorandum In Support Of Its Motion For Summary Judgment ("SeptiTech Memo.," ECF 36-1) ¶ 1. SeptiTech LLC, formerly known as Polymer Supply, LLC ("Polymer"), is a Connecticut Limited Liability Company. Compl. ¶ 2.

In December 2005, Progressive entered into a distributor agreement (the "Distributor Agreement") with SeptiTech, Inc., a Maine corporation that was later known as ST Liquidating Corp.[3] SeptiTech Memo. ¶ 2. SeptiTech, Inc. was a manufacturer of "Pre-Treatment Package Wastewater Treatment Systems." *Id.* ¶ 2. It had a manufacturing facility in Maine, where its office was located. SeptiTech Motion Ex. C 26.

Pursuant to the Distributor Agreement, SeptiTech, Inc. granted Progressive the "exclusive right to sell" SeptiTech, Inc.'s septic systems in Maryland. SeptiTech Motion Ex. B § 2. The Distributor Agreement contained a termination provision, which provided, in part: "[T]his Agreement may be terminated by either party, at any time, with or without cause, by giving sixty (60) days written notice to the other party . . . ." *Id.* § 14(L). In addition, the Distributor Agreement stated: "No amendment, supplement, modification, waiver or termination of this Agreement shall be binding unless executed in writing by the party to be bound thereby." *Id.* § 14(B). Further, the Distributor Agreement stated that it "shall be construed and interpreted according to the laws of the State of Maine without regard to conflict of law principles thereof." *Id.* § 14(G).

---

[3] In their submissions, both sides refer to SeptiTech, LLC as "SeptiTech." SeptiTech, LLC refers to both SeptiTech, Inc. and ST as "ST," while Progressive refers to SeptiTech, Inc. as "old SeptiTech" and "ST." To avoid confusion between SeptiTech, Inc. and SeptiTech, LLC, the Court will generally refer to SeptiTech, LLC as "SeptiTech," and will refer to SeptiTech, Inc. either by that name or ST, depending on the context.

SeptiTech, Inc. experienced financial difficulties. SeptiTech Memo. ¶ 4. In 2008, it contacted James Nichols, one of the owners of Polymer, about acquiring SeptiTech, Inc. *Id.* On or about February 9, 2009, SeptiTech, Inc. and Polymer entered into an Asset Purchase Agreement (the "Asset Agreement"),[4] by which Polymer agreed, *inter alia,* to pay "almost one-million dollars" in exchange for SeptiTech, Inc.'s assets. SeptiTech LLC's Reply To Plaintiff's Opposition To SeptiTech LLC's Motion For Summary Judgment And Opposition To Plaintiff's Cross-Motion For Partial Summary Judgment ("SeptiTech Reply," ECF 43) 7; *see* SeptiTech Memo. 5. Polymer and SeptiTech, Inc. also agreed that SeptiTech, Inc. would forego its name, and Polymer would adopt the name of SeptiTech, LLC. SeptiTech Motion Ex. D § 2.6; SeptiTech Motion Ex. F. Section 5.6 of the Asset Agreement provided:

> **Name Change.** Prior to February 18, 2009, Seller [i.e., SeptiTech, Inc.] and any of Seller's affiliates shall change its respective legal name in each jurisdiction in which it is organized or qualified to do business to a name that does not include "SeptiTech" (it being understood that all rights to the name "SeptiTech" and any trademarks, trade names or logos derived therefrom are included in the Acquired Assets and are validly transferred to Buyer hereby) and provide written evidence of the same to Buyer.

SeptiTech Motion Ex. D. Thereafter, SeptiTech, Inc. became ST Liquidating Corp. and SeptiTech, LLC was formed.

Subject to exceptions not applicable here, the Asset Agreement explicitly excluded the purchase by Polymer of "any obligation or liability of Seller or its predecessors arising out of any Contract, Permit, franchise or claim that is not contemplated to be transferred to Buyer as part of the Acquired Assets, including . . . the Distributor Agreements." SeptiTech Motion Ex. D § 2.4(j). The Asset Agreement provided that "the Excluded Liabilities are not, and shall not be, assumed by [SeptiTech], but instead are, and shall be, retained, performed, paid and discharged

---

[4] CHK Capital Partners, LLC ("CHK") was also a party to the Asset Agreement. Its role is not in issue.

by Seller or CHK." *Id.* § 2.4. Moreover, the Asset Agreement defined the term "Acquired Assets" to "expressly exclude[]" any of SeptiTech, Inc.'s rights under "the Distributor Agreements . . . to which [SeptiTech, Inc.] is a party." *Id.* § 1.1(g). It also provided that, "[f]or two (2) years after the Closing Date, [SeptiTech, Inc.] shall not dissolve, liquidate or be declared bankrupt . . . or otherwise become subject to insolvency laws." *Id.* § 5.3.[5]

In connection with the Asset Agreement, James Nichols and his sons, Lee Verbridge, Trevor Nichols, Geoffrey Nichols, and Justin Nichols, became the owners of SeptiTech. None of them had held an ownership interest in or management role with SeptiTech, Inc. SeptiTech Memo. ¶ 5. SeptiTech continued with the general business that SeptiTech, Inc. had been conducting, using SeptiTech, Inc.'s old manufacturing facility and the equipment and patents that SeptiTech purchased under the Asset Agreement.[6] Progressive Memo. ¶¶ 4, 6. Although SeptiTech, Inc. continued to exist as a corporate entity under the name ST, it ceased operations. *See* SeptiTech Motion Ex. D § 5.3.

Progressive alleged in its Complaint that it was "advised by Polymer Supply that Polymer Supply did not want to enter into a new distributor agreement with it." Compl. ¶¶ 19-20. In fact, Progressive and SeptiTech never entered into a written distributor agreement.

At his deposition, James Nichols explained why Polymer did not want to acquire SeptiTech, Inc.'s distributor agreements in connection with the Asset Agreement. He stated that, at the time, SeptiTech, Inc. was "essentially insolvent," and "had been unsuccessful in the way they had managed the business." SeptiTech Motion Ex. C 29:20-29:21. In Mr. Nichols's view,

---

[5] With regard to choice of law, the Asset Agreement provided: "This Agreement shall be governed by and construed in accordance with the internal laws of the State of Connecticut applicable to agreements made and to be performed entirely within the State of Connecticut, without regard to the conflicts of laws principles thereof." *Id.* § 7.4.

[6] According to Mr. Verbridge's testimony, SeptiTech used SeptiTech, Inc.'s manufacturing facility until April 2009. Progressive Motion Ex. C 44:17-45:3.

SeptiTech, Inc.'s poor performance was due, in part, to "their distribution model," which Polymer "wished to change." *Id.* at 30:2-30:3. He added: "We were contemplating a different distribution channel. . . . Their distributors were primarily contractors. And we were contemplating using actual distributors who distributed other related products, some even larger national companies." *Id.* at 30:6-30:13.

Mr. Verbridge also testified as to why SeptiTech did not want "exclusive distributors." He said: "It's not a good way to do business," adding: "It limits our ability to sell to customers." SeptiTech Motion Ex. E 30:17-30:19.

Scott Samuelson had served as SeptiTech, Inc.'s "director of marketing" for several years. SeptiTech Motion Ex. J. In an undated affidavit,[7] submitted in support of SeptiTech's summary judgment motion, Mr. Samuelson averred: "I am employed as the director of marketing and business development for SeptiTech, LLC." *Id.* On February 10, 2009, one day after the Asset Agreement was signed, Samuelson sent a letter, via e-mail, addressed to "SeptiTech Distributors," on "SeptiTech" letterhead.[8] SeptiTech Memo. ¶ 9; Progressive Motion Ex. E. It stated: "SeptiTech, Inc. has sold its business and substantially all of its assets to Polymer Supply, LLC (Polymer). Polymer, a company controlled by Jim Nichols and his son, Lee Verbridge, will be the new owner of SeptiTech, Inc.'s business. Polymer will be adopting the SeptiTech name very soon." *Id.* Further, the letter stated: "Lee [the new President of SeptiTech] intends to meet with all of you right away . . . . During those meetings Lee will also

---

[7] No challenges are lodged to any affidavits on the ground that they are undated.

[8] The letterhead does not explicitly identify "SeptiTech" as Inc. or LLC. The address on the letterhead is 70 Commercial Street, Suite # 3, Lewiston, Maine 04240. SeptiTech Motion Ex. F. The record does not disclose the entity that used that address. However, in the Asset Agreement, Polymer used a Connecticut Address. SeptiTech Motion Ex. D § 7.2(a).

be discussing the terms of new agreements for the current distributors. *Polymer is not acquiring the existing agreements, which will terminate following the closing*." *Id.* (Emphasis added.)[9]

According to Progressive, Samuelson "was just one of several management-level employees of [SeptiTech, Inc.] who came to work for SeptiTech upon closing on the Asset Purchase Agreement," on February 9, 2009. Progressive Memo. ¶ 7. Progressive asserts that when Samuelson sent the letter on February 10, 2009, he was acting on behalf of SeptiTech, because "by that time [he] was working for SeptiTech and not [SeptiTech, Inc.]." *Id.*

SeptiTech construes the letter of February 10, 2009, as having identified Samuelson as an employee of SeptiTech, Inc. SeptiTech Memo. ¶ 9; *see* SeptiTech Motion Ex. F. At his deposition, James Nichols testified that on February 10, 2009, Samuelson was employed by SeptiTech, Inc. SeptiTech Motion Ex. A. 20:3. But, Nichols did not know if the closing on the Asset Agreement had actually occurred by the time the letter was sent by Samuelson. *Id.* at 20:16-20:17.

In any event, it is undisputed that Progressive received the letter of February 10, 2009, from "SeptiTech." Bruce Melton acknowledged at his deposition that the letter came from Samuelson, an employee of both "the old SeptiTech" and "the new SeptiTech." The following deposition testimony of Bruce Melton is pertinent:

> Q. . . . Did there ever come a time when you received notice that the distributor agreement was being terminated?
>
> A. Yes.

---

[9] Samuelson's letter is written in the first person plural, e.g., "we anticipate the SeptiTech brand to compete favorably . . . . [O]ur goal is for you to grow with us." SeptiTech Motion Ex. F. The letter further indicated: "We are optimistic that this change will be of significant benefit to all." *Id.* When Mr. Nichols was asked at his deposition how the change in ownership would be of benefit to the SeptiTech, Inc.'s distributors, given that Polymer did not plan to continue the distributor agreements, he said: "The old SeptiTech would have most likely gone out of business and been unable to provide product to them at all." SeptiTech Motion Ex. C 32:6-32:8.

Q. When was that?

A. February of '09.

Q. And who provided you with that notice?

A. It was an e-mail we received from SeptiTech.

* * *

Q. Is there any way for you to know who [Mr. Samuelson] was sending this e-mail on behalf of?

A. It looks like the old SeptiTech.

* * *

Q. So it appears Mr. Samuelson was sending this as an employee of the old SeptiTech?

A. I assume so, yes.

SeptiTech Motion Ex. A 27:13-31:6.

Notwithstanding Progressive's receipt of Samuelson's letter, Progressive asserts that, at a meeting with the Meltons in Maryland in February 2009, Mr. Verbridge orally advised that the Distributor Agreement between SeptiTech, Inc. and Progressive would remain in effect. Progressive Memo. ¶ 8.[10]  Based on those representations, Bruce Melton "assumed" that they "still had a contract."  Progressive Motion Ex. H 53:20-53:21.  Recognizing that "everything was oral," *id.* at 50:3, Melton explained that he did not believe a writing was necessary because "we already had a contract."  *Id.* at 50:1-50:2.  As additional proof that the Distributor Agreement between SeptiTech, Inc. and Progressive was "still in full force and affect" [sic] as between

---

[10] At his deposition, Ryan Melton testified that Progressive was "told that [SeptiTech, LLC was] not going to set up a new agreement with [Progressive]."  SeptiTech Memo. ¶ 10.  Bruce Melton indicated at his deposition that Mr. Verbridge had stated that SeptiTech had not purchased the distributor agreements.  SeptiTech Motion Ex. A 47:1-47:5.

Progressive and SeptiTech, Progressive cites SeptiTech's "insistence on using the contractually agreed warranty payments to pay for work by Progressive." *Id.* ¶ 9; *see* SeptiTech Motion Ex. A 49:13-49:14.

SeptiTech presents a different account of the meeting between Verbridge and the Meltons. At his deposition, Mr. Verbridge said: "I told [Progressive] business was going to move forward as usual, but with a few changes. One, there would be a nonexclusive agreement moving forward. And two, I wanted to get to know Bruce [Melton] and the operation a little bit before . . . we decided what we were doing in the future." Progressive Reply Ex. 1, at 54:8-54:13.

During the sixty day period beginning February 10, 2009, SeptiTech did not sell any new equipment to Progressive. SeptiTech Memo. ¶ 16. In an undated affidavit, Tracy Parker, SeptiTech's office manager, stated: "SeptiTech's business records demonstrate that from February 9, 2009 until May 26, 2009 SeptiTech did not sell any equipment to Progressive." SeptiTech Motion Ex. H ¶ 7. After May 2009, however, SeptiTech again began selling septic systems to Progressive, although Progressive did not have exclusivity in Maryland.[11] But, Parker averred that, by June 30, 2009, Progressive "fell into arrears with its payments to SeptiTech and SeptiTech has not sold any systems to Progressive since that time." SeptiTech Ex. H ¶ 8.

In April 2009, Mr. Samuelson (then at SeptiTech) received a call from Wicomico County, Maryland, informing him that the County had a property that needed a SeptiTech system installed within 48 hours. SeptiTech Memo. ¶ 17. In response to the call, SeptiTech sold a

---

[11] Ms. Parker stated in her affidavit: "From May 27, 2009 until June 30, 2009, SeptiTech sold Progressive thirteen SeptiTech systems." SeptiTech Motion Ex. H ¶ 7.

system to Ron Posey, the contractor on the job. *Id.* In June 2009, SeptiTech sold another system to Mr. Posey. *Id.*

This suit followed. Additional facts will be included in the discussion.

## Discussion

### I. Standard of Review

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is properly granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party must demonstrate through the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that a reasonable jury would be unable to reach a verdict for the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). When this burden is met, the non-moving party then bears the burden of demonstrating that there are disputes of material fact and that the matter should proceed to trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249. A party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586; *see also In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999).

When, as here, the court is faced with cross-motions for summary judgment, the court applies the same standard of review to both motions. The court must "review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir.) (internal quotation marks omitted), *cert. denied*, 540 U.S. 822 (2003).

## II. Choice of Law

The parties contest which state's law applies to one of the theories underpinning Progressive's breach of contract claim in Count Two. With respect to the tort claim in Count Six, SeptiTech has assumed that Maryland law applies, and Progressive has not addressed the issue. SeptiTech Memo. 14. When an action is based on diversity of citizenship, a court applies the substantive law of the state in which it sits, including its choice of law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Because choice of law analysis is issue-specific, different states' laws may apply to different issues in a single case, a principle known as "dépeçage." BLACK'S LAW DICTIONARY 469-70 (8th ed. 2004).

Under a Maryland choice-of-law analysis, a court must determine at the outset "the nature of the problem presented to it for solution, specifically, if it relates to torts, contracts, property, or some other field, or to a matter of substance or procedure." *Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 615, 925 A.2d 636, 646 (2007). In tort actions, Maryland follows the rule of *lex loci delicti*, which means that the court applies the substantive law of the state where the wrong occurred. *Id.* at 620, 925 A.2d at 648-49. In contract actions, however, Maryland courts generally apply the law of the jurisdiction where the contract was made, pursuant to the principle of *lex loci contractus*. *See, e.g., Allstate Ins. Co. v. Hart*, 327 Md. 526, 529, 611 A.2d 100, 101 (1992). But, Maryland "has long recognized the ability of contracting parties to specify

in their contract that the laws of a particular State will apply in any dispute over the validity, construction, or enforceability of the contract, and thereby trump the conflict of law rules that otherwise would be applied by the court." *Jackson v. Pasadena Receivables, Inc.*, 398 Md. 611, 617, 921 A.2d 799, 803 (2007).

Section 187(1) of the *Restatement (Second) of Conflict of Laws (1988)*, recognized in Maryland, *Jackson*, 398 Md. at 618, 921 A.2d at 803, articulates this principle and the exceptions to it. It provides, in part: "The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue."

Section 187(2) applies where more than one state has an interest in the parties or the transaction. It provides:

> The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either
>
> > (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
> >
> > (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188,[12] would be the state of the applicable law in the absence of an effective choice of law by the parties.

With these principles in mind, the Court next considers the parties' contentions.

### III. Breach of Contract

---

[12] Maryland's "adherence to § 187(2) is tempered by the fact that Maryland has not adopted the 'most significant relationship' test stated in § 188 of the Restatement (Second) but has maintained its allegiance to the *lex loci contractus* principle." *Jackson*, 398 Md. at 619 n.3, 921 A.2d at 804 n.3.

In Count Two, Progressive contends that SeptiTech breached the Distributor Agreement. Although SeptiTech is not a party to that contract, Progressive avers that SeptiTech is liable for the breach because "SeptiTech, by part performance assumed the distributor agreement entered into by Progressive and [SeptiTech, Inc.]" In particular, Progressive relies on SeptiTech's "words and . . . conduct." Progressive Memo. 5. Alternatively, based on principles of corporate successor liability, Progressive contends that SeptiTech is liable to Progressive under the Distributor Agreement. *Id.* at 6.

The Court turns first to Progressive's contentions as to the actions that allegedly constituted a breach of the Distributor Agreement.

Progressive argues: "SeptiTech breached the terms of the distributor agreement it assumed in purchasing the assets of [SeptiTech, Inc.] by terminating the agreement without the notice required under the agreement." Compl. ¶¶ 35-36. According to Progressive, Samuelson's letter of February 10, 2009, was ineffective to terminate the agreement, because it did not satisfy the "required notice of termination under the agreement." Progressive Memo. 5. In particular, Progressive claims the notice was defective because it was sent by Mr. Samuelson, who was no longer an employee of SeptiTech, Inc. (or ST) at that time. *Id.* Rather, he was "one of the former [SeptiTech, Inc.] employees who continued with SeptiTech after closing on the sale on February 9, 2009." *Id.* As a result, argues Progressive, Samuelson lacked authority to terminate the Distributor Agreement on behalf of SeptiTech, Inc. Plaintiff, Progressive Septic Services, Inc.'s Reply Memorandum Of Law In In [sic] Support Of Progressive Septic Services, Inc.'s Motion For Summary Judgment And In Opposition To Defendant, SeptiTech, LLC's Motion For Summary Judgment ("Progressive Reply," ECF 44) 1. In addition, at his deposition Bruce

Melton claimed the letter was deficient because it did not "explicitly" state that the Distributor Agreement would terminate in sixty days.[13]  SeptiTech Motion Ex. A 59:6-59:8.

SeptiTech counters:  "[T]he Asset Purchase Agreement establishes that the Distributor Agreement was an asset" of SeptiTech, Inc., which SeptiTech did not purchase from SeptiTech, Inc.  SeptiTech Memo. 10.  Because SeptiTech, Inc. owned the Distributor Agreement, only SeptiTech, Inc. could have breached it, according to SeptiTech.  *Id.* at 10-11.  In any event, argues SeptiTech, the Distributor Agreement was properly terminated via the letter of February 10, 2009.  *Id.* at 11.  In its view, "all that is required under the Distributor Agreement is that a notice of termination be in writing and that it be delivered to a representative of the other company."  SeptiTech Reply 5.  Given that Progressive indisputably received the letter, SeptiTech posits:  "Whether Mr. Samuelson was an employee of [SeptiTech, Inc.] or SeptiTech[, LLC] on February 10, 2009 is irrelevant to the determination of the validity of the notice of termination."  *Id.*

SeptiTech concedes that "the notice of termination [Progressive] received on February 10, 2009 was not effective until sixty (60) days . . . had passed."  SeptiTech Memo. 11-12.  But, it argues that the sixty-day issue is of no moment because, during the sixty-day period that followed the letter of February 10, 2009, SeptiTech "sold no equipment to (that is, did no business with) Progressive."  *Id.* at 12.  Moreover, SeptiTech argues that "any claim for breach . . . in this sixty (60) day time frame would only be proper against ST."  *Id.*

## A.

As I see it, the letter of February 10, 2009, was sufficient to terminate the Distributor Agreement, effective sixty days from the date of the notice.  Section 14(L) of the Distributor

---

[13]  Pursuant to §14(L) of the Distributor Agreement, Progressive was entitled to sixty days' notice.  However, Progressive does not make clear reference to § 14(L).

Agreement states that the Distributor Agreement may be terminated "by either party, at any time." Whether Mr. Samuelson was employed by Septictech, Inc. or SeptiTech, LLC on February 10, 2009, is of no consequence; the Distributor Agreement did not, by its terms, preclude him from providing such notice. To suggest otherwise is to exalt form over substance. Moreover, given that the parties did no business in the sixty days following the Samuelson letter, it is specious to suggest that the termination was ineffective because it did not specifically reference the requisite sixty-day effective date.

B.

Even if the notice were not sufficient, I am satisfied that SeptiTech did not assume the Distributor Agreement. As a result, SeptiTech is not liable for any breach of that agreement.

In support of its assertion that SeptiTech, by its words and conduct, assumed the Distributor Agreement, Progressive relies on Ryan Melton's deposition. He testified that Verbridge orally "led" Progressive to "believe that [SeptiTech] would assume the contract" and that Progressive was "still a distributor" of SeptiTech. SeptiTech Motion Ex. G 53:11-53:14. Further, he testified that Mr. Verbridge told the Meltons that SeptiTech "did not want to change [SeptiTech, Inc. and Progressive's distributor] agreement," *id.* at 46:7-46:8, that "[Verbridge] was not going to change [that] agreement at that time," *id.* at 46:20-46:21; and that "he was going to keep things the way they were." *Id.* at 47:1.

In addition, Progressive asserts that "it is undisputed that [SeptiTech] continued to operate under the terms of the Distributor Agreement . . . . Indeed, [everything continued] as before for several months." Progressive Reply 2. Progressive also cites "SeptiTech's . . . insistence on abiding by contractually [sic] terms for warranty work under its contract." Progressive Memo. 6.

Ryan Melton pointed to an incident when Progressive sought to invoice SeptiTech for services it had performed, but "at a higher rate than what was in the contract." Progressive Motion Ex. G 54:3-54:5. He explained that SeptiTech "refused to pay what we billed them for and only would pay what was in [the Distributor Agreement]." *Id.* at 54:5-54:7. In addition, Melton indicated that he believed SeptiTech had assumed the Distributor Agreement because "it was business as usual" after the Asset Agreement. *Id.* at 54:19. Bruce Melton offered similar deposition testimony. He claimed that, on one occasion, SeptiTech "insisted" that, when Progressive performed service on a septic system at SeptiTech's request, it had to bill in accordance with the rate in the Distributor Agreement, which was lower than the amount that Progressive sought. SeptiTech Motion Ex. A 51:5-52:12.

SeptiTech specifically denies the alleged oral statements made by Mr. Verbridge with respect to the continuation of the Distributor Agreement. SeptiTech Memo. 12. Under SeptiTech's version of the facts,[14] Mr. Verbridge "specifically informed [the owners of Progressive] that '[t]here would be no more exclusive arrangements in each state' and that SeptiTech was 'not going to assume the previous distributor agreements.'" SeptiTech Reply 9. With regard to Progressive's account of the labor it performed for SeptiTech on that one occasion, the following deposition testimony of Mr. Verbridge is pertinent:

Q. And how did you come up with $65 an hour [as a labor rate for Progressive]?

A. It was an agreed upon rate between my – myself and my team.

Q. Were you aware that that was also the rate that was set forth in the distributor agreement? The distributor agreements between SeptiTech and its distributors?

A. I didn't know what the last rate was.

Progressive Motion Ex. C 43:8-43:15.

---

[14] The Court is mindful that disputes of fact cannot be resolved on summary judgment.

SeptiTech also argues that the alleged oral statements could not have formed a contract between Progressive and SeptiTech, because Maryland's Uniform Commercial Code ("UCC") requires that all distributor agreements comply with the statute of frauds. SeptiTech Memo. 13 (citing Md. Code (2002 Repl. Vol.), § 2-201 of the Commercial Law Article ("C.L.")). It contends that, under § 14(B) of the Distributor Agreement,[15] any modification of the Distributor Agreement, making SeptiTech a party to it, had to be in writing. *Id.* at 12-13. As there was no such writing, SeptiTech contends that the termination letter of February 10, 2009, was valid and applicable to Progressive. *Id.* at 13.

It is clear that, in its purchase of SeptiTech, Inc.'s assets, SeptiTech did not expressly assume any distributor agreements. To the contrary, it explicitly excluded them. As SeptiTech was not a party to the Distributor Agreement in issue, and did not expressly assume it, the choice-of-law provision in that agreement (selecting Maine law) does not govern the question of whether SeptiTech's course of conduct constituted an implied assumption of the Distributor Agreement. As the alleged oral representations and conduct of SeptiTech took place in Maryland, I conclude that Maryland's law applies, pursuant to *lex loci contractus*.

Under C.L. § 2-106, a "contract for sale" is defined to include both a "present sale of goods and a contract to sell goods at a future time." In Maryland, a "contract for sale" of goods costing $500 or more must satisfy the statute of frauds, the requirements of which are set forth in C.L. § 2-201. It provides, in pertinent part:

> [A] contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker.

---

[15] Section 14(B) provides, in part: "No amendment, supplement, modification, waiver or termination of this Agreement shall be binding unless executed in writing by the party to be bound thereby." SeptiTech Motion Ex. B § 14(B).

Notably, Maryland's Court of Special Appeals has interpreted this UCC provision to apply to distributorship contracts. *Cavalier Mobile Homes, Inc. v. Liberty Homes, Inc.*, 53 Md. App. 379, 394, 454 A.2d 367, 376, *cert. denied*, 295 Md. 736 (1983); *see also Orteck Int'l Inc. v. Transpacific Tire & Wheel, Inc.*, No. DKC 2005-2882, 2006 WL 2572474, at *21-22 (D. Md. Sept. 5, 2006) (applying the UCC's statute of frauds to a purported exclusive distributor agreement, based on *Cavalier Mobile Homes*); *Cont'l Casing Corp. v. Siderca Corp.*, 38 S.W.3d 782, 788 n.1 (Tex. App. 2001) (citing *Cavalier Mobile Homes* to support the view that "[t]he courts in at least 18 jurisdictions have applied the UCC to distributorship agreements").

In *Cavalier Mobile Homes*, a mobile homes manufacturer (Liberty) entered into annual agreements authorizing a retailer (Cavalier) to sell its mobile homes. 53 Md. App. at 382, 454 A.2d at 370. These agreements provided for termination "for any reason by either party following 30 days notice." *Id.* At some point, Liberty terminated the Liberty-Cavalier dealership agreement and authorized one of Cavalier's competitors to sell its mobile homes. *Id.* Cavalier then filed suit against Liberty, alleging, *inter alia*, breach of the dealership contract based on some mobile homes that Cavalier had ordered but not received from Liberty *after* the thirty days' notice had been provided. *Id.* at 390-91, 454 A.2d at 374-75. The Maryland appellate court held that Cavalier could not maintain a breach of contract claim, because it failed to produce evidence of an agreement that satisfied the statute of frauds. *Id.* at 392, 454 A.2d at 375. In its determination that the statute of frauds applied to the agreement between the parties, the court reasoned:

> The Maryland Uniform Commercial Code, [C.L.] § 2-106 (1975) defines "contract for sale" to include both a "present sale of goods and a contract to sell goods at a future time." It follows therefrom that dealership or distributorship contracts fall within the sales provisions of the U.C.C. It also follows that the Article II Statute of Frauds, found at § 2-201, applies to such agreements.

*Id.* at 395, 454 A.2d at 376 (citation omitted).

Even assuming that Mr. Verbridge made the alleged oral representations claimed by Progressive, *Cavalier Mobile Homes* teaches that SeptiTech could not have orally assumed the Distributor Agreement in issue. Therefore, the parties' dispute as to whether SeptiTech made oral representations is not material to the breach of contract claim; such representations failed to satisfy the statute of frauds.

Nor could SeptiTech's post-Asset Agreement dealings with Progressive constitute an assumption of the Distributor Agreement. As noted, it is clear that the exclusive Distributor Agreement was terminated pursuant to Samuelson's letter of February 10, 2009. SeptiTech's subsequent insistence on using the same labor rate set forth in the Distributor Agreement may suggest that SeptiTech knew of the rate, but that, alone, hardly constitutes an assumption of the contract. That Progressive attempted to charge SeptiTech a rate higher than the one set forth in the Distributor Agreement certainly undercuts its argument that it believed the Distributor Agreement remained in effect.

## C.

Progressive also argues that, as a matter of law, SeptiTech assumed the Distributor Agreement because the new business is a "mere continuation" of SeptiTech, Inc., and therefore successor liability attaches, either under Maryland law or Maine law. Progressive Memo. 6. Before exploring the parties' contentions in more detail, I shall first consider the concept of successor liability.

Ordinarily, a corporation that merely purchases the assets of another corporation will not be liable for the debts or other liabilities of that corporation. *See* 15 WILLIAM MEADE FLETCHER, FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 7124 (rev. ed. 2008). However, some

18

courts have recognized implied assumptions of liability that serve as exceptions to the general rule of nonliability of successor corporations.

One exception involves "the continuation of business theory," also known as the "mere continuation" of business exception. *Id.* § 7124.10. As the name suggests, the "mere continuation" exception applies "when the transferee corporation is merely a continuation or reincarnation of the transferor corporation"; to wit, a change in corporate form, but not in substance, has occurred. *Id.* The policy behind the "mere continuation" exception is the notion of preventing corporations from using asset sales to place those assets out of the reach of creditors (i.e., where "the purchasing corporation maintains the same or similar management and ownership but wears a 'new hat.'"). *Id.*

In general, in jurisdictions that have adopted the "mere continuation" exception, "the test is whether there is a continuation of the corporate entity of the transferor, not whether there is a continuation of the transferor's business operations." *Id.* Indicia that have been considered by courts include "common officers, directors, and shareholders, and only one corporation in existence after completion of the sale of assets." *Id.*

Some courts have expanded the "mere continuation" exception to a doctrine known as the "continuity of enterprise" exception. *Id.* § 7123.20. In general, this exception applies in products liability cases. *Id.* Under this exception, "a successor may be liable for injuries caused by its predecessor's products if it continues to manufacture the same product, for the same market, and under the same trade name." *Id.* Courts will consider such factors as "(1) continuity of management, personnel, physical location, and assets; (2) dissolution of the predecessor; (3)

assumption of the ordinary business obligations and liabilities by the successor; and (4) the successor's presentation of itself as the continuation of the predecessor."[16]  *Id.*

In support of its position that, as a matter of law, SeptiTech assumed the Distributor Agreement under principles of successor liability, Progressive points out that SeptiTech, Inc. "was left without any assets" to meet its obligations after the execution of the Asset Agreement. Progressive Reply 2.  In addition, Progressive asserts:  "It is . . . undisputed that SeptiTech filled all open orders placed by the distributors of [SeptiTech, Inc.]"  *Id.*  Further, Progressive points out that SeptiTech "is using the patents, products, names and other intellectual property of [SeptiTech, Inc.]  Most of the employees are the same.  It is in the exact same business . . . and as to the ultimate customers there is no change."  Progressive Memo. 6.  Although Progressive cites Maryland law in support of its argument for successor liability, it maintains that "Maine law is similar."  *Id.*

SeptiTech claims that it is not bound by the Distributor Agreement.  Nonetheless, it asserts that, pursuant to § 14G of the Distributor Agreement, Maine law controls the issue of successor liability.  In its view, under Maine's law of successor liability, SeptiTech is not liable for an alleged breach of the Distributor Agreement because it merely purchased SeptiTech, Inc.'s assets, in connection with a bona fide, arms-length transaction.  SeptiTech Reply 6-7.  In this regard, SeptiTech points out that it paid "almost one-million dollars in consideration" for

---

[16] Another recognized exception to the general rule of successor nonliability is known as the "de facto merger" exception.  *Id.* § 7124.20.  The exception typically applies "[w]hen a transaction has the economic effect of a statutory merger but is cast in the form of an acquisition or sale of assets, even though the transaction does not meet the statutory requirements for a merger."  *Id.*  Progressive does not allege a "de facto merger," however.

In addition, some courts recognize an exception in regard to fraud.  In those cases, courts allow creditors to "follow the property into the hands of the new corporation."  *Id.* § 7125.  But, there are no fraud allegations here.

SeptiTech, Inc.'s assets, and that its current corporate ownership did not hold a management or ownership stake in SeptiTech, Inc. *Id.* at 7.

But, even if Maryland law were to apply, SeptiTech claims that no successor liability attaches, because SeptiTech is not a "mere continuation" of SeptiTech, Inc. as a corporate entity. *Id.* at 10-11. Again, SeptiTech points to the substantial consideration it paid for SeptiTech, Inc.'s assets, as well as the change in corporate ownership and management. *Id.* at 11. Moreover, SeptiTech contends that there is no merit to Progressive's argument, which SeptiTech characterizes as a "continuity of enterprise" theory, because Maryland does not recognize the continuity of enterprise theory as a basis for successor liability. *Id.*

In the Distributor Agreement, SeptiTech, Inc. and Progressive selected Maine in its choice-of-law clause. As noted, SeptiTech argues that Maine law governs, while Progressive assumes that Maryland law governs, and claims that it is similar to Maine's law. Although both parties appear to indicate that Maine law is acceptable, Progressive is incorrect in suggesting that Maine and Maryland are similar. Maryland recognizes the "mere continuation" theory advanced by Progressive, *Balt. Luggage Co. v. Holtzman*, 80 Md. App. 282, 290, 62 A.2d 1286, 1290 (1989), *cert. denied*, 318 Md. 323 (1990), but Maine does not. *Dir. of Bureau of Labor Standards v. Diamond Brands, Inc.*, 588 A.2d 734, 736 (Me. 1991).[17]

Because both SeptiTech and SeptiTech, Inc. are located in Maine, I am inclined to the view that Maine law would govern the question of SeptiTech, LLC's successor liability for

---

[17] In the Asset Agreement, SeptiTech, Inc. and Polymer (now SeptiTech, LLC) selected Connecticut in its choice-of-law provision. Although Connecticut accepts the "mere continuation" theory, *Chamlink Corp. v. Merritt Extruder Corp.*, 899 A.2d 90, 93 (2006), neither side argues that Connecticut law governs here.

SeptiTech, Inc.'s obligations.[18]  However, I need not resolve the choice of law question, because the outcome would be the same under either Maine or Maryland law.  As noted, Maine does not recognize the "mere continuation" theory of successor liability.  Although Maryland recognizes the theory, Progressive's claim, taken in the light most favorable to Progressive, fails to satisfy the elements of "mere continuation."

*Director of Bureau of Labor Standards v. Diamond Brands, Inc.*, *supra,* 588 A.2d 734, is instructive.  There, Maine's Supreme Judicial Court stated:  "[A]bsent a contrary agreement by the parties, or an explicit statutory provision in derogation of the established common law rule, a corporation that purchases the assets of another corporation in a *bona fide*, arm's-length transaction is not liable for the debts or liabilities of the transferor corporation."  *Id.* at 736.

Diamond Brands purchased the assets of Diamond Match, including a plant in Dixfield. *Id.* at 735.  The purchase agreement specifically disclaimed Diamond Brands's liability for any severance pay owed to Diamond Match employees.  *Id.*  Subsequent to the asset sale, Diamond Brands continued operations at the Dixfield plant for about two years, employing the same management personnel and marketing its paper products to the former customers of Diamond Match.  *Id.*  After it closed that plant, however, Diamond Brands was sued to recover severance pay for the company's terminated employees.  *Id.*  In its application of a severance pay statute, the Supreme Judicial Court of Maine refused to extend successor liability to Diamond Brands, based on the asset sale.  *Id.* at 736.  Although the plaintiffs argued that Diamond Brands was a

---

[18] Parties to an asset purchase agreement may control what liabilities are expressly assumed, but cannot determine whether, in fact, a party's conduct following an asset purchase agreement constitutes a "mere continuation" that would allow third parties to lodge claims against the purchaser.  Indeed, if parties coud determine in advance, by contract, whether the circumstances of the asset sale constituted a "mere continuation," that would defeat the entire purpose of such an equitable principle, which is to see beyond the paper trail left by the parties. *See generally Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 465 (3rd Cir. 2006).

"mere continuation" of Diamond Match, the court reasoned that the plaintiffs had "generated no genuine issue of material fact regarding the nature of the asset purchase between the two corporations," i.e., no suggestion of fraudulent intent or improper purpose. *Id.* at 736 n.5.

Federal courts sitting in diversity and applying Maine law have interpreted *Diamond Brands* as unequivocal that Maine has not adopted either the "mere continuation" or "continuity of enterprise" exceptions to the general, common law rule against successor liability in asset sales. *See, e.g.*, *Ambrose v. Southworth Prods. Corp.*, 953 F. Supp. 728, 735 (D.W. Va. 1997) ("Given the Supreme Judicial Court of Maine's seemingly absolute pronouncement in *Diamond Brands*, this court will not expand singlehandedly Maine's interpretation of successor liability to embrace the mere continuation theory."); *Saco River Tel. & Tel. Co. v. Shooshan & Jackson, Inc.*, 826 F. Supp. 580, 583 (D. Me. 1993) ("Maine law does not appear to recognize [the mere continuation and continuity of enterprise] exceptions to the common law rule.").

Here, the result is the same as in *Diamond Brands*. The asset sale was a bona fide, arm's-length transaction, in which SeptiTech did not agree to assume SeptiTech, Inc.'s liabilities, such as distributor agreements. Given the ample consideration furnished by Polymer for SeptiTech, Inc.'s assets, coupled with the change in corporate ownership and management, and the lack of any allegation or indicia of fraud or improper purpose in connection with the Asset Agreement, Maine law would not impose successor liability upon SeptiTech.

Even if the Court were to apply Maryland law as to successor liability, I am satisfied that Progressive would not prevail in regard to its assertion that SeptiTech is a "mere continuation" of SeptiTech, Inc. As indicated, the "mere continuation" exception is "designed to prevent a situation whereby the specific purpose of acquiring assets is to place those assets out of reach of predecessor's creditors." *Balt. Luggage Co.*, 80 Md. App. at 297, 562 A.2d at 1293. Maryland's

rule of successor liability, as set forth in *Baltimore Luggage Co.*, *id.* at 290, 562 A.2d at 1289-90, is as follows:

> The general rule of corporate liability is that, ordinarily, a corporation which acquires the assets of another corporation is not liable for the debts and liabilities of the predecessor corporation. There are, however, four exceptions to this general rule. The debts and liabilities of the predecessor corporation are imposed on the successor corporation when (1) there is an expressed or implied assumption of liability; (2) the transaction amounts to a consolidation or merger; (3) the purchasing corporation is a mere continuation of the selling corporation; or (4) the transaction is entered into fraudulently to escape liability for debts.

As indicated, indicia that give rise to the "mere continuation" exception include, among others, "common officers, directors, and stockholders; and only one corporation in existence after the completion of the sale of assets." *Id.* at 291, 562 A.2d at 1293; *see Acad. of IRM v. LVI Envtl. Servs., Inc.*, 344 Md. 434, 453-54, 687 A.2d 669, 677 (1997) ("[T]he purchasing corporation maintains the same or similar management and ownership but wears a 'new hat.'" (citation omitted) (internal quotation marks omitted)). Moreover, Progressive overlooks that the gravamen of the "mere continuation" theory is whether the corporate entity continues, not whether the *enterprise* or the business itself continues. *Nissen Corp. v. Miller*, 323 Md. 613, 620, 593 A.2d 564, 567 (1991). Indeed, Maryland's Court of Appeals has explicitly rejected a "continuity of enterprise" theory as a basis for successor liability. *Id.* at 632, 593 A.2d at 573;[19] *see Acad. of IRM*, 344 Md. at 451, 687 A.2d at 677.

---

[19] The plaintiff in *Nissen Corp. v. Miller* brought a products liability action against Nissen, the successor corporation to the company that had originally created the product. 323 Md. at 615, 594 A.2d at 656. As the plaintiff could not prevail on a "mere continuation" theory, he argued that Nissen should bear successor liability based on a "continuity of enterprise" theory, *id.* at 621, 594 A.2d at 567, because Nissen "held itself out as the effective continuation of [the seller], selling replacement parts, performing some contracts, retaining some employees, honoring existing 90-day warranties, and servicing customer accounts." *Id.* at 621, 594 A.2d at 568. The Maryland Court of Appeals disagreed, refusing to adopt the "continuity of enterprise" theory as it is "inconsistent with Maryland law." *Id.* at 633, 594 A.2d at 574.

*Baltimore Luggage*, 80 Md. App. 282, 62 A.2d 1286, provides guidance. There, a Rhode Island company ("RI") acquired the assets, company name, and trademark of a Maryland company ("MD"). *Id.* at 285, 562 A.2d at 1287. After the sale, MD reincorporated as a New York corporation, and RI conducted its business under the name Baltimore Luggage. *Id.* at 299, 562 A.2d at 1294. Notwithstanding that both companies shared the name Baltimore Luggage, the Maryland Court of Special Appeals determined that RI was not a "mere continuation" of MD giving rise to successor liability. It pointed to "a change of ownership and management," payment by RI of a substantial consideration in connection with a *bona fide* sale, and the continuation of both corporations after the sale. *Id.* at 298, 562 A.2d at 1294.

SeptiTech is not a "mere continuation" of SeptiTech, Inc. Polymer paid "almost one-million dollars" for SeptiTech, Inc.'s assets. SeptiTech Reply 7. Moreover, SeptiTech's owners, James Nichols and his sons, never held an ownership or management stake in SeptiTech, Inc., nor do SeptiTech, Inc.'s owners hold a stake in SeptiTech. SeptiTech Memo. ¶ 5. Although SeptiTech, Inc. has ceased to operate, Progressive acknowledges that it continues to exist as a corporation "in good standing with its principal place of business in the State of Maine," Compl. ¶ 3, in compliance with § 5.3 of the Asset Agreement.[20] That SeptiTech, hired former employees of SeptiTech, Inc. and, until April 2009, operated from the same plant as SeptiTech, Inc., does not compel the conclusion that SeptiTech is a mere continuation of SeptiTech, Inc. And, as *Baltimore Luggage* makes clear, adoption of the SeptiTech name, while operating a similar business, does not give rise to successor liability under the "mere continuation" exception.

_____

[20] As shown, that clause required that, "[f]or two (2) years after the Closing Date, [ST] shall not dissolve, liquidate or be declared bankrupt . . . or otherwise become subject to insolvency laws." SeptiTech Motion Ex. D.

<u>IV.  Tortious Interference With Contract</u>

In Count Six of its Complaint, Progressive avers that SeptiTech interfered with three contracts Progressive held with Mr. Posey for the installation of septic systems in Wicomico County, Maryland.  Compl. 9; *see* SeptiTech Motion Ex. A 60:6-60:7.  In particular, it claims that SeptiTech "refus[ed] to supply the systems ordered by Progressive from it and direct[ed] that RCR Septic Services provide the systems to Mr. Posey."  Compl. ¶¶ 54-55.

In its summary judgment motion, SeptiTech asserts that it cannot be liable for tortious inference of contract for three reasons:  (1) no valid contracts existed between Progressive and Mr. Posey, (2) even if the contracts existed, SeptiTech did not know about them and (3) in any event, SeptiTech's conduct was justified.  SeptiTech Memo. 14-16.

First, with regard to its contention that no contracts existed between Progressive and Mr. Posey, SeptiTech relies on Mr. Posey's undated affidavit, in which he avers that he and Progressive never entered into any contracts.  *Id.* at 15; *see* SeptiTech Motion Ex. K.  Even if there were contracts, SeptiTech argues that any purported contracts were for expensive septic systems that exceeded $500 in value, and as such, had to comply with the UCC's statute of frauds.  SeptiTech Memo. 15.

Second, SeptiTech refers to Mr. Samuelson's affidavit, in which he states:  "I was the representative from SeptiTech[, LLC] who dealt with Mr. Posey.  At no time in my dealings with Mr. Posey did I have any knowledge of the existence of any contracts between Mr. Posey and Progressive."  SeptiTech Motion Ex. J ¶ 8.

Third, SeptiTech maintains that, because it was not subject to the Distributor Agreement, it was "free to sell to whom ever [sic] it pleased."  Accordingly, it claims that it was "justified" in selling septic systems to Mr. Posey.  SeptiTech Memo. 16.

In its cross-motion/opposition, Progressive does not address SeptiTech's motion as to Count Six. In its Reply, however, Progressive devotes one paragraph to SeptiTech's contentions. It argues that "the systems had been ordered by Progressive from SeptiTech through the State program under which they were to be installed." Progressive Reply 2.

By affidavit, Mr. Posey denied that he had any contractual agreements with Progressive. In fact, Mr. Posey identified only one matter with Progressive; he averred that in 2009 he "contacted Progressive to inquire about ordering a SeptiTech septic system." SeptiTech Motion K ¶ 4. He added: "At that time, I was informed by Progressive that they did not have any SeptiTech septic systems in stock and that there would be a substantial wait before Progressive would be able to deliver any SeptiTech septic systems. I needed the SeptiTech system sooner than Progressive said it could provide the system, and, as such, I did not order a SeptiTech system from Progressive. This was essentially my only dealing with Progressive." *Id.*

At Mr. Samuelson's deposition, he recounted his understanding of how SeptiTech became involved with Mr. Posey. The following exchange is relevant:

Q. Had you shipped that system [that eventually went to Mr. Posey] to Progressive, to your knowledge?

A. Well, Progressive had stock systems, you know, at one point. But due to, you know, payment issues . . . they did not have systems that were able to be shipped at that time.

* * *

Q. . . . Did Progressive . . . have a system to install in that situation?

A. I don't believe they had.

Q. Did Progressive ask that one be shipped so they can install it?

A. . . . [T]hey were [in] arrears in payments. And once they paid a certain allotted amount that was predesignated, we would ship them another system, or

two, or whatever. * * * I mean when they paid a certain chunk of money, we would ship them another system or two.

Q. . . . So at that point in time they did not have, with the Ron Posey situation, a system to install?

A. That's correct, to my knowledge.

*Id.* at 43:16-45:13.

Progressive relies on Ryan Melton's deposition testimony for the proposition in its Complaint that Progressive had three contracts with Mr. Posey. Progressive Reply 2; *see* Progressive Reply Ex. 2, at 57:13-57:20. At his deposition, Ryan Melton conceded that Progressive did not have any written contracts with Mr. Posey. Progressive Reply Ex. 2, at 62:10-62:11. Rather, he claimed that "[e]verything was done orally," *id.* at 62:16, and it was his belief that Progressive held "verbal agreements" with Mr. Posey. *Id.* at 62:11. The following deposition testimony of Ryan Melton is relevant:

Q. And when were these oral communications?

A. In the winter and spring of 2009.

Q. Okay. And who were the communications between?

A. The communications were between myself, Ron Posey, and when it comes from -- Mack McNeally. * * * Mack McNeally is head of the -- I don't know what his exact position is, but he's in charge of the Bay Restoration Fund for Wicomico County.

Q. Okay. And there's no document trail. There's no evidence of when these -- exactly when these conversations happened, no documentary evidence?

A. There is some.

Q. What would those documents be?

A. The prices that -- and I believe I submitted these to you, but if I didn't, I can.
     There are -- the prices that Ross [sic] Posey submitted for payment to Wicomico County were the prices provided by us and not by SeptiTech.

*Id.* at 62:17-63:20.[21]

Progressive also contends: "SeptiTech's own witnesses support that [SeptiTech] shipped several septic systems ordered by Progressive for installation by Mr. Posey." Progressive Reply 2. Progressive identified Mr. Verbridge as the SeptiTech witness whose testimony supports this assertion. At his deposition, however, Mr. Verbridge indicated that he did not know whether the contract to install a septic system for Mr. Posey was "obtained through the efforts of Progressive." Progressive Reply Ex. 1, at 38:19-38:21. He also did not know whether the

---

[21] SeptiTech notes that Bruce Melton "claimed that Progressive [only] provided Mr. Posey with 'a written bid' for each of the contracts, but no such documents have been produced." *Id.* ¶ 18. The deposition testimony of Bruce Melton, set forth below, appears to contradict that of Ryan Melton. The following colloquy is pertinent:

> Q. . . . When were these contracts entered?
>
> A. I don't know the exact time. * * * [T]he way that the state and the counties were handling this program, we could have given a bid today that may not have produced a job for two months.
>
> So I'm not sure when they were submitted to Ron Posey.
>
> Q. . . . There's no written contract between Progressive and Ron Posey, correct?
>
> A. *Just a written bid, bid for a job.*
>
> Q. Progressive delivered to Ron Posey a written bid?
>
> A. Yes. * * * In the process, in Wicomico County . . . they would request bids from contractors for specific units. * * * [T]hey had a rolling list of manufacturers that they used. And for the ones that were SeptiTech, they would send contractors and ask them to submit a bid on a SeptiTech unit. * * * At which time they would call us and we would send them our estimate to them for what our cost to them would be.
>
> And they submitted that along with their estimate to the county to get the job.
>
> Q. *So you sent them a quote.*
>
> A. *A quote, a bid, yes.* (Emphasis added.)

SeptiTech Motion Ex. A 60:18-62:17. For the purpose of the summary judgment motions, the Court has accepted Ryan Melton's account.

system was delivered directly to Mr. Posey, nor did he recall if the system delivered to Mr. Posey had been ordered by Progressive. *Id.* at 39:7-39:17. But, he explained: "Progressive Septic was 90 days past due on payment. They had not ordered anything because they hadn't paid their previous bill." *Id.* at 39:17-39:19.[22] When later asked if "there [were] any systems ordered by Progressive from SeptiTech . . . which were not delivered to Progressive," Mr. Verbridge responded: "We delivered when he [Bruce Melton] was paid in full. There was [sic] a few systems when he was very past due that we held." *Id.* at 54:14-54:19.

As discussed, Maryland follows the rule of *lex loci delicti* for tort actions. *Erie Ins. Exch.*, *supra*, 399 Md. at 620, 925 A.2d at 648-49. Because the alleged tort occurred in Maryland, the Court will apply Maryland law with respect to Progressive's claim of tortious interference of contract.

As an initial matter, SeptiTech is incorrect in regard to its argument that Progressive cannot premise its tortious interference claim on alleged oral contracts. In a cause of action for tortious interference with contract, the Maryland Court of Appeals has held that a contract that is not enforceable for failure to comply with the statute of frauds can still form the basis for a tortious interference claim. *Daughtery v. Kessler*, 264 Md. 281, 286-87, 286 A.2d 95, 98 (1972); *see Pease v. Wachovia SBA Lending, Inc.*, 416 Md. 211, 239, 6 A.3d 867, 884 (2010) ("'[C]ontracts which are voidable by reason of the statute of frauds . . . can still afford a basis for a tort action . . . .'" (citation omitted)).

Maryland recognizes two types of tort actions for interference with business relationships: "'inducing the breach of an existing contract and, more broadly, maliciously or wrongfully interfering with economic relationships in the absence of a breach of contract.'"

---

[22] As noted, in her affidavit Parker discussed Progressive's arrears.

*Kaser v. Fin. Prot. Mktg., Inc.*, 376 Md. 621, 628, 831 A.2d 49, 53 (2003) (quoting *Natural Design, Inc. v. Rouse Co.*, 302 Md. 47, 69, 485 A.2d 663, 674 (1984)). Progressive has only alleged tortious interference with existing contracts. Compl. ¶¶ 53-27.

Under Maryland law, a claim for tortious interference with contract has the following five elements: "(1) existence of a contract between plaintiff and a third party; (2) defendant's knowledge of that contract; (3) defendant's intentional interference with that contract; (4) breach of that contract by the third party; and (5) resulting damages to the plaintiff." *Fowler v. Printers II, Inc.*, 89 Md. App. 448, 466, 598 A.2d 794, 802 (1991).

Notably, "the law does not permit the conversion of every breach of contract into a tort action, merely because one effect of the breach is to prevent or hinder the plaintiff in carrying out his obligations under other contracts." *Winternitz v. Summit Hills Joint Venture*, 73 Md. App. 16, 27, 532 A.2d 1089, 1094 (1987), *cert. denied*, 312 Md. 127 (1988). To establish tortious interference with contract, the interference necessarily has to be "intentional[] and improper[]." RESTATEMENT OF TORTS (SECOND), *supra*, §§ 766-766B; *see Macklin v. Robert Logan Assocs.*, 334 Md. 287, 301, 639 A.2d 112, 119 (1994) ("To establish tortious interference with prospective contractual relations, it is necessary to prove both a tortious intent and improper or wrongful conduct."); *Friedman & Fuller, P.C. v. Funkhouser*, 107 Md. App. 91, 113, 666 A.2d 1298, 1309 (1995) (noting the "tortious intent and improper or wrongful conduct" elements with respect to a claim for tortious interference with an alleged (oral) contract); *Winternitz*, 73 Md. App. at 28, 532 A.2d at 1095 ("The key element is the fact of intentional and improper conduct that prevents or burdens performance by the plaintiff . . . .").

Intent is proven "by showing that the defendant intentionally induced the breach or termination of the contract in order to harm the plaintiff or to benefit the defendant at the

expense of the plaintiff." *Macklin*, 334 Md. at 301, 639 A.2d at 119. Yet, the presence of tortious intent, by itself, is not dispositive. The Maryland Court of Appeals has said: "Simply because a person induces another to exercise an existing right to terminate a contract, even if that person's intention with regard to one of the parties to the contract is tortious, does not make it actionable." *Id.* at 302, 639 A.2d at 119. If the person "had the right to cause the termination," then "his or her conduct is not improper." *Id.*

Indeed, "[i]t is well established that a defendant may avoid liability for tortious interference with a contract by proving that its conduct was justified or excused in some way." *Fowler*, 89 Md. App. at 467, 598 A.2d at 803. The right to interfere with a contract terminable at will arises from the notion that "there is no legal assurance of future performance" with such a contract, and "it is even questionable whether . . . the defendant can even be said to have induced the termination of the contract; it is expected that one with the option to do so, will terminate a contract when presented with good reasons for doing so." *Macklin*, 334 Md. at 305, 639 A.2d at 121. Thus, "where the contract is one terminable at will, it must also be shown that the defendant otherwise acted improperly or wrongfully." *Id.*

With regard to contracts terminable at will, competition may justify an actor's conduct. *Id.* at 302-03, 639 A.2d at 119-20. Maryland courts have made clear that "acting to pursue one's own business interests at the expense of others is not, in itself, tortious." *Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc.*, 336 Md. 635, 654, 650 A.2d 260, 269 (1994). Thus, "interference with another's contract or business relations in the name of competition is improper

only if the means used are, in themselves, improper." *Macklin*, 334 Md. at 302, 639 A.2d at 119.[23]

As indicated, Progressive claims that it had three oral contracts with Mr. Posey. SeptiTech disputes that contention.[24]  Of course, the credibility of witnesses would be for the fact-finder to resolve.  But, even in the light most favorable to Progressive, and even assuming the existence of these oral contracts, the evidence presented to the Court is wholly insufficient to generate a question of fact as to whether SeptiTech had knowledge of their existence.

Progressive's entire argument as to SeptiTech's knowledge is contained in the following sentence:  "[T]he prices . . . submitted for payment to Wicomico County were the prices provided by [Progressive] and not by SeptiTech[, LLC]."  Progressive Reply Ex. 2, at 63:17-63:20.  Progressive has not submitted any documentation to provide the context that would render this assertion meaningful, or any additional evidence that suggests that SeptiTech was aware of prior contractual dealings between Progressive and Mr. Posey.  The undisputed evidence also shows that Progressive was in arrears and unable to supply the septic systems to Mr. Posey.

In addition, Progressive has failed to generate a question of fact as to whether SeptiTech acted with the intent to interfere with any purported contracts between Progressive and Mr. Posey.  Indeed, Progressive has failed to allege *any* specific facts indicating that it was SeptiTech's *intent* to "induce[] the breach or termination of the contract in order to harm [Progressive] or to benefit [SeptiTech] at the expense of [Progressive]."  *Macklin*, 334 Md. at 301, 639 A.2d at 119.  In this regard, Progressive does not dispute the evidence presented by

---

[23] However, "[w]hen the existing contract is not terminable at will, inducing its breach, even for competitive purposes, is itself improper and, consequently, not 'just cause' for damaging another in his or her business."  *Macklin*, 334 Md. at 303, 639 A.2d at 120.

[24] The discovery deadline in this case expired on November 19, 2010.

SeptiTech to the effect that it was contacted by Mr. Posey. If it was Mr. Posey who reached out to SeptiTech, then SeptiTech would not have induced the breach of a purported contract between Progressive and Posey.

A separate Order consistent with this Opinion will follow.


Date: March 15, 2011             ___/s/_____
                                                Ellen Lipton Hollander
                                                United States District Judge